## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| ORIBEL PTE LTD., | § | |
|     *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO.  2:24-CV-00977-JRG |
| THE WILLIAM CARTER COMPANY, | § | |
| CARTER'S RETAIL INC., AND SKIP HOP, | § | |
| INC., | § | |
| | § | |
|     *Defendants*. | § | |
| | § | |

## MEMORANDUM CLAIM CONSTRUCTION OPINION AND ORDER

In this patent case, Oribel PTE Ltd. alleges infringement by Carter's Retail Inc., The William Carter Company, and Skip Hop Inc. (together, "Defendants") of claims from U.S. Patent 10,736,437 (the "'437 Patent"). The '437 Patent relates "to a portable activity center that can be used by a child for participating in different activities." '437 Patent at 1:7–8.

The parties dispute the scope of three terms from these claims. Having considered the parties' briefing, along with arguments of counsel at a February 19, 2026 hearing, the Court resolves those disputes as follows.

## I.    BACKGROUND

The '437 Patent purports to address "ongoing consumer interest for a new and improved apparatus for young children that is easily portable, lightweight, safe, and compact for easy storage and transportation, provides a child with the ability to engage in a variety of activities and is relatively inexpensive to manufacture[.]" '437 Patent at 1:24–30. To that end, the patent discloses a portable activity center with a frame, a tray coupled to the frame with an opening, a seat support surrounding the opening, and a seat within the opening that is securely attached to the seat support.

A cover interchangeable with the seat and positioned within the opening operates to convert the activity center into a table. *Id.* at [57].



**FIG. 27 (left) of the '437 Patent shows a seat support (110) and seat (112) in the opening (109). FIG. 32 (right) shows the seat support and seat removed and a cover (238) over the opening.**

Figure 1 (above) "is a perspective view of a preferred embodiment of the portable activity center shown in its seating configuration." '437 Patent at 3:1–3. The embodiment (100) has a frame supported by foldable telescoping legs (104), a tray (106) attached to the frame, a seat support (110) that supports a seat (112), and a support ring (140) attached to each leg by a strap (138). *See generally id.* at 6:12–7:37.

As shown more clearly in Figure 26 (below), the tray "includes a plurality of apertures 220 for receiving the attachment end 222 of an interchangeable playgroup accessory 224, such as [a] snap-in toy (i.e. a rattle, toy figure, or other conventional snap-in children's toy), book support, a drawing system, bucket, and a playhouse." '437 Patent at 9:45–51. The attachment ends have plates (230) that can bend "inwardly toward each other such that they easily insert[] into apertures 220 and are biased outwardly . . . away from each other [after insertion] to provide a frictional fit."

2

*Id.* at 9:55–58. "When the interchangeable playgroup accessory 224 is pulled upwardly, the parallel plates 230 are pushed inwardly towards each other to facilitate removal of the interchangeable playgroup accessory 224." *Id.* at 9:59–62. Figures 34–38 show various interchangeable playgroup accessories removably mounted to the tray. *Id.* at 12:4–18.



**FIG. 26 of the '437 Patent**

The disputed terms concern Claims 3, 4, and 11, all of which indirectly depend from Claim 1. Claims 1–3 recite:

1. A portable activity center for use by a young child comprising:

a frame;

a plurality of legs for supporting the frame;

a tray mounted to the frame, the tray having an opening;

a seat support mounted to the tray;

a seat positioned within the opening, the seat having a top annular section, a lower crotch section and mid section between the top annular section and the lower crotch section, wherein the seat is positioned securely attached, via the top annular

3

section, to the seat support; and

at least one elastic portion in the mid section of the seat that operate to permit the seat to support a child placed within the seat and to permit vertical reciprocating movement with respect to the frame in response to bouncing movement by the child.

2. The portable activity center of claim 1 further comprising a cover placed over the opening to convert the portable activity center into a table structure.

3. The portable activity center of claim 2, further comprising one or more removable interchangeable **playgroup accessories** that are removably secured to the tray or the cover.

'437 Patent at 12:65–13:21 (emphasis added). Claims 10–11 recite:

10. The portable activity center of claim 1 wherein the tray includes a horizontal radial surface circumferentially surrounding the seat support and provides a support surface for objects placed on the tray.

11. The portable activity center of claim 10 wherein the horizontal radial surface **slopes radially inwardly** towards the seat.

*Id.* at 13:49–55 (emphasis added). Claims 13, 18, and 21 include the same terms. *See id.* at 14:1–4 (requiring, in Claim 13, the tray of Claim 1 to "include[] a plurality of apertures adapted for receiving an attachment end of a removable **interchangeable playgroup accessory**"), 14:27–28 (reciting, in Claim 18, "at least one **interchangeable playgroup accessory** removably secured to said cover"), 14:36–38 (requiring, in Claim 21, the tray of Claim 18 to have "a surface that **slopes radially inwardly** towards said opening").

## II.     LEGAL STANDARDS

### A.     Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to

exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips,* 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in

the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B.    Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 909. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### III.    THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the

6

technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, neither party addresses the level of ordinary skill in the art in its briefing. Accordingly, the Court will address that level of skill only to the extent necessary to resolve the disputes.

## IV.    THE DISPUTED TERMS

### A.    "playgroup accessor[y]/[ies]" ('437 Patent, Claims 3, 13, 18)

| Oribel's Construction | Defendants' Construction |
|---|---|
| Not indefinite<br><br>"a conventional children's snap-in toy, a bucket, a book support, a drawing system, or a playhouse"<br><br>"conventional children's snap-in toy(s), bucket(s), book support(s), drawing system(s), and/or playhouse(s)" | Indefinite |

Defendants say this term is indefinite because the intrinsic record fails to provide objective boundaries for the term, and a skilled artisan would not be reasonably certain of its meaning. Dkt. No. 56 at 4. Defendants note certain dependent claims and the written description provide examples, but assert those examples fail to cabin the scope's term. *Id.* at 4–5. And "[b]ecause the specification provides only a handful of non-limiting examples for what may constitute 'playgroup accessories' while also remaining open to infinite other possibilities," *id.* at 8, the term is indefinite. Nor does extrinsic evidence help. *Id.* at 5 (citing *playgroup*, Merriam-Webster.com Dictionary, Dkt. No. 56-2, and *playgroup*, Cambridge Dictionary, Dkt. No. 56-3).

Oribel gives three reasons why the term is definite. First, the patent "repeatedly describes and illustrates the different forms the playgroup accessories can take," and explains that accessories provide educational or entertainment value for children. Dkt. No. 60 at 5. Second, the patent

examiner identified book supports and drawing systems as "playgroup accessories," which shows the term has a definite meaning. *Id.* at 6. Finally, Defendants' senior product-development manager had no issue recognizing the term's scope, so neither would a skilled artisan reviewing the specification. *Id.*

This term is not indefinite. A term without an ordinary meaning might not be indefinite if its scope can be fairly inferred from the intrinsic record. *IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 904 (Fed. Cir. 2020) ("The failure to define [a] term is . . . not fatal, for if the meaning of the term is fairly inferable from the patent, an express definition is not necessary." (quoting *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004)). Here, the patent explains the portable activity center of the claims "can be used for participating in different activities." '437 Patent at 1:7–8. The patent also explains these accessories "provide educational and/or entertainment activities for a child." *Id.* at 12:37–38.

Importantly, the patent never uses "playgroup accessories" without the "interchangeable" modifier, indicating the "playgroup accessories" must also be something that is a part of the "portable activity center for use by a young child." Given that, there is no risk a skilled artisan would think a jump rope or scissors, for example, would fall within the scope of the term, as those are not "interchangeable."[1] *See* Dkt. No. 56 at 5 (asking "[a]re books or puzzles considered 'playgroup accessories' simply because they can be placed somewhere on the tray or table? What about scissors or snack trays?"); Hr'g Tr., Dkt. No. 71 at 7:6–7 (asking "[i]s a jump rope a playgoup accessory?").

Moreover, Defendants provide no evidence of the level of ordinary skill at the time of

---

[1] The Court addresses the scope of "interchangeable" *infra*.

invention, much less evidence of why a skilled artisan would be unable to determine the bounds of the claim language. That's problematic given Defendants' burden to prove indefiniteness by clear and convincing evidence. *Sonix Tech.*, 844 F.3d at 1377 ("Indefiniteness must be proven by clear and convincing evidence."). Because Defendants have not met that burden, the Court construes "playgroup accessory" as "accessory designed to provide educational or entertainment activities for a child."

**B.      "interchangeable playgroup accessor[y/ies]" (437 Patent, Claims 3, 13, 18)**

| Oribel's Construction | Defendants' Construction |
|---|---|
| Not indefinite<br>"an interchangeable conventional children's snap-in toy, bucket, book support, drawing system, or playhouse"<br>"interchangeable conventional children's snap-in toy(s), bucket(s), book support(s), drawing system(s), and/or playhouse(s)" | Indefinite<br>If "playgroup accessories" is not indefinite, then "playgroup accessor[y]/[ies] that can be exchanged in place of other playgroup accessory[y]/[ies]" |

Defendants frame this dispute as whether an accessory that can merely be repositioned is "interchangeable." Dkt. No. 56 at 9. According to Oribel, "interchangeability means that one playgroup accessory can be exchanged for another playgroup accessory that can be used somewhere on the tray or cover." Dkt. No. 60 at 9. It does not, however, "require that the replacement occupy the same physical position as the original." *Id.* Defendants respond that "an 'interchangeable' accessory is distinct from an accessory that can simply be repositioned[.]" Dkt. No. 56 at 9. In fact, Defendants, at least in their briefing, suggest that for two accessories to be "interchangeable" they must have the same function. *See id.* at 9 n.1 (asserting that, "while both a bell and a basket are bicycle accessories, they are not 'interchangeable' as they have different functions and cannot be exchanged in place of each other"); *see also id.* at 10 (citing *interchangeable*, Cambridge

Dictionary, Dkt. No. 56-4 ("able to be exchanged with each other without making any difference or without being noticed")).

As the parties clarified at the hearing, this dispute is about imposing a "position limitation" on the word "interchangeable." *See* Hr'g Tr., Dkt. No. 71 at 24:18–23 (noting that, with their construction, Defendants try to "clarify the distinction between [1] a removable accessory or one that can be repositioned with [2] an interchangeable accessory which needs to be exchanged with—in place of—some sort of other playgroup accessory" and "[i]t's that position limitation that we're trying to get at"). In Defendants' view, although two "interchangeable playground accessories" don't have to attach in the exact same way, they do "have to be able to fit in the same general area." *Id.* at 23:5–8; *see also id.* at 19:12–15 (asserting "[i]f I put an activity center in front of you and it has a playgroup accessory on one side and then I add a playgroup accessory to the other side, that's not interchangeable; that's just an activity center that has multiple playgroup accessories on top of [it]"). Oribel, however, resists "the notion that the interchanging required by the claims is an interchanging with another one of the group of playgroup accessories." *Id.* at 26:14–17. Thus, the Court must decide if "interchangeable playgroup accessories" are simply "playgroup accessories that can be exchanged," *id.* at 26:20–23, or whether they must be "exchangeable *with other playgroup accessories.*"

Based on the patent, the latter option is the better choice. For one, the specification is replete with examples of "interchangeable playgroup accessories" with the same type of "attachment ends" that fit into the same set of disclosed apertures. Thus, the specification shows "interchangeable" means "interchangeable" with other playgroup accessories, not simply removable or repositionable. This is consistent with the ordinary meaning of "interchangeable." *See interchangeable,* Cambridge Dictionary, Dkt. No. 56-4 ("able to be exchanged with each other without making any

difference or without being noticed"). This is also consistent with the presumption that different claim terms, like "removable" and "interchangeable," have different scope. *See Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1289 (Fed. Cir. 2008) (noting "the general assumption is that different terms have different meanings"). This also gives "interchangeable" the same meaning when used elsewhere in the claims. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

Oribel's main argument against Defendants' position is that "being interchangeable with other playgroup accessories" reads out embodiments. For example, according to Oribel, Figure 32 shows a book support attached to the cover, which Oribel suggests would mean, under Defendants' construction, it is not "interchangeable" with the other playgroup accessories disclosed in the patent. Hr'g Tr., Dkt. No. 71 at 30:15–19; *see also id.* at 29:7–11 (suggesting Defendants' position "would eliminate [the] embodiment from figure 36 from satisfying claim 18," which "only requires that at least one interchangeable playgroup accessory be removably secured to the cover").

On that point, the Court agrees with Oribel that "interchangeable" does not require the accessories to have the exact same footprint. For example, the patent discloses the cover is interchangeable with the seat, and those are two fundamentally different components with different attachment mechanisms and different footprints. But in the disputed phrase, "interchangeable" suggests some characteristic common to each of the accessories—something more than they can just be positioned on the top of the tray. The Court will address that commonality with its construction of "playgroup accessor[y]/[ies] that can be exchanged with other playgroup accessor[y]/[ies]."

11

### C.    "slopes radially inwardly" ('437 Patent, Claims 11, 21)

| Oribel's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning | "slants continuously toward a central point" |

Claims 1, 10, and 11 recite:

1. A portable activity center for use by a young child comprising:

   a frame;

   . . .

   a tray mounted to the frame, the tray having an opening;

   a seat support mounted to the tray; [and]

   a seat positioned within the opening . . . .

   * * *

10. The portable activity center of claim 1 wherein the tray includes a horizontal radial surface circumferentially surrounding the seat support and provides a support surface for objects placed on the tray.

11. The portable activity center of claim 10 wherein the horizontal radial surface **slopes radially inwardly** towards the seat.

'475 Patent at 12:65–13:14, 13:49–55 (emphasis added); *id.* at 14:36–38 (requiring, in Claim 21, a tray with an opening that has "a surface that slopes radially inwardly towards said opening").

The parties dispute whether the recited radially inward slope of the "horizontal radial surface" must be "continuous." Saying it must, Defendants point to the specification's description of an embodiment, shown in Figure 8 (below), in which "the horizontal planar portion 180 slopes inwardly such that the likelihood of toys, containers, and other such objects resting on the planar portion 180 will not easily slide or roll off the tray 106 or out of reach of a child positioned in the seat 112." Dkt. No. 56 at 14 (quoting '437 Patent at 8:65–9:3). Defendants also cite dictionary definitions for "radially inwardly" and "slope." *Id.* Citing Oribel's infringement contentions,

12

Defendants accuse Oribel of claiming a vertical ridge separating two horizontal surfaces meets this limitation. Id. at 15.



**FIG. 8 of the '437 Patent as annotated by Oribel, Dkt. No. 55 at 14, with the red line showing the profile of the horizontal surface**

Oribel contests that "slopes radially inward" requires the surface to "slant continuously" or have a central point. Dkt. No. 60 at 14. In its view, the disputed phrase "means [only] that the tray and/or the horizontal radial surface of the tray around the seat/opening is sloped." *Id.* Oribel asserts Defendants' construction would confuse the jury because it is nonsensical in the context of the claims. *Id.* at 15.

At the hearing, Defendants clarified it was not asserting the "central point" of its construction necessarily requires that point to be at "the exact center." *See* Hr'g Tr., Dkt. No. 71 at 48:2–15 (indicating Oribel should "not be worried about the opening for the seat not being directly in the physical center of the table"). Nor does it contend that a curved surface, as opposed to a straight "slant," is outside the scope of the term "slope." *Id.* at 47:2–4 ("We're not suggesting it's a straight line. We're not ruling out the possibility of curves."). Thus, so far as the Court can tell, the parties only dispute whether a "vertical ridge separating two horizontal surfaces"—that is, a "step"

13

profile—literally meets this limitation.



**Oribel contends the highlighted surface, which accordingly to Defendants assert is a vertical surface or ridge, slopes radially inward towards the seat. *See* Infringement Contentions, Dkt. No. 56-7 at 47–48.**

The Court struggles to see how it could. If, as Oribel acknowledges, a vertical ridge does not slope radially inwardly, *see* Hr'g Tr. at 43:25–44 ("[a] vertical ridge in isolation may not necessarily be something that slopes radially inwardly"), it's hard to see how two horizontal surfaces (each with no slope) separated by a vertical surface (which does not "slope radially inwardly") could combine to, as a whole, "slope radially inwardly." To make that argument, one would seemingly have to take the starting and ending points of this "step" profile, draw a line between them, and claim the slope of that line is the "slope" of the recited horizontal surface. Moreover, that argument would rely on a "step" profile having *two* horizontal surfaces, each with no slope. Still, as Oribel cautions, this is more of an infringement question than one of disputed scope, and the Court will reserve judgment until that phase of the proceeding.

14



**A "step" profile (blue) with two horizontal surfaces separated by a vertical surface. The red dashed line connects the ends of the profile and would have radially inward slope toward the opening.**

That said, the jury would benefit from some explanation of what this technical phrase means. To that end, given Defendants' agreement that the term does not exclude curves, the Court construes "slopes radially inwardly" as "slopes downward toward a central point."

## V.   CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "playgroup accessor[y]/[ies]" ('437 Patent, Claims 3, 13, 18) | "accessor[y]/[ies] designed to provide educational or entertainment activities for a child" |
| "interchangeable playgroup accessor[y/ies]" ('437 Patent, Claims. 3, 13, 18) | "playgroup accessor[y]/[ies] that can be exchanged with other playground accessor[y]/[ies]" |
| "slopes radially inwardly" ('437 Patent, Claims 11, 21) | "slopes downward toward a central point" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

So ORDERED and SIGNED this 22nd day of April, 2026.


RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE